DR. P. K. SMITH ET AL V. D. H. BOLIN ET AL

No. A-4398. Decided July 14, 1954.
Rehearing overruled October 13, 1954.
(271 S.W. 2d Series 93)

C. J. Brannan, Rogers & Eggers, Nelson Montgomery, Robertson & Sellers and Ernest Robertson, all of Wichita Falls, for petitioners.

The Court of Civil Appeals erred in holding that there was no genuine fact issue raised by the evidence on the hearing on defendants' motion for summary judgment, which rendered premature the trial court's disposition of plaintiffs' suit to impress a constructive trust on the oil and gas leases in controversy, and in holding that defendant's acquiring the leases, which he had formerly held in trust for plaintiffs, in his own name was

no violation of a fiduciary duty to the plaintiffs, in refusing them participation with him in such renewal leases.

White v. White, 141 Texas 328, 172 S.W. 2d 295; Munsey v. Mills & Garitty, 115 Texas 469, 283 S.W. 754; Johnson v. Peckham, 132 Texas 148, 120 S.W. 2d 786.

*Kilgore & Kilgore and John E. Kilgore,* of Dallas, for respondents.

In reply to petitioners points of error. Collins v. Gee, 107 S.W. 2d, 754, writ of error refused; Lubbock Grain Co. v. Ferguson, 227 S.W. 539; Warner v. Winn, 145 Texas 302, 197 S.W. 2d 338.

MR. JUSTICE SMITH delivered the opinion of the Court.

This appeal is from a summary judgment. The petitioners filed suit in equity against the respondent, D. H. Bolin, and against the other respondents who are his assigns, to recover an interest in certain oil properties in Montague County, Texas, by means of a constructive trust. The trial court's action in granting respondent's motion for summary judgment has been affirmed by the Court of Civil Appeals. 261 S.W. 2d 352.

Petitioners assert that the following issues of fact were raised which preclude the rendition of summary judgment:

1. That in acquiring for his personal benefit renewals of oil and gas leases on the Howard lands Bolin violated a fiduciary duty to petitioners.

2. That in acquiring for his benefit the farm-out leases on the Gist and Crownover tracts he likewise violated a fiduciary duty to petitioners.

3. That Bolin obtained geological information in the drilling done on the Howard leases while active in a fiduciary relationship to the petitioners, which partly induced him to purchase the farm-out leases and to obtain the renewal of the Howard leases for his personal benefit.

■ In determining the question of whether or not material issues of fact were raised by the evidence, the court must, under the law, first view all the evidence in the light most favorable to the petitioners; disregard the conflicts in the testimony;

and indulge, in favor of the petitioners, every intendment reasonably deducible from the evidence. White v. White, 141 Texas 328, 172 S.W. 2d 295; Fitz-Gerald v. Hull, 150 Texas 39, 237 S.W. 2d 256. A summary judgment is not proper if the evidence raises issues of fact to be determined by a court or jury. See McDonald on Texas Civil Practice, Vol. 4, Sec. 17.26, pp. 1380, 1382.

■ The suit was based upon a written partnership agreement entered into between the parties on December 1, 1946. Whether the relationship between D. H. Bolin and the petitioners was a continuous relationship until about June 1950, as contended by the petitioners, or whether it was a series of separate and distinct relationships as contended by respondent, D. H. Bolin, is a question of fact. In an appeal from a summary judgment, this Court should only determine the question of whether or not a fact issue was raised by the pleadings, affidavits and evidence.

Some of the evidence, which raises a fact or fact issues as to the Howard leases, is as follows:

The petitioners are doctors and business men. They were never engaged primarily in the oil business. Respondent, D. H. Bolin, has been actively engaged in the oil business for more than 30 years; the petitioners trusted respondent, D. H. Bolin, and had complete confidence in his integrity. On December 1, 1946, by written partnership agreement, they designated Mr. Bolin as the business manager of the partnership; they agreed to pay into the common fund to enable operations to begin two-thirds (2/3) thereof and respondent one-third (1/3). All funds were to be deposited to the credit of the partnership, to be checked out only on checks duly signed by D. H. Bolin, or under his direction. D. H. Bolin alone transacted the partnership business. This partnership was entered into at the solicitation of respondent, D. H. Bolin. At no time during the period from December 1, 1946 until sometime in June, 1950, did he inform petitioners that he was not acting under the terms of the written partnership agreement of December 1, 1946. The written agreement provided that the business activities of the parties should continue so long as the parties might mutually desire. Respondent also acted as contractor in drilling wells on leased property, which included the property referred to as the Howard leases in Montague County, Texas. The Howard leases, as well as all other leases, were originally taken in the name of D. H. Bolin. The Howard leases were to expire on March 12, 1950. When

asked, in February 1950, to secure renewals or extensions of the Howard leases for the partnership, Mr. Bolin replied: "We could no more get that then we could get wings and fly to Heaven this afternoon." When urged, in November 1949, to obtain the farm-out leases for the partnership on the Gist leases, Mr. Bolin advised one of the petitioners that he had checked the geology and was not interested in those farm-outs. On March 9th or 10th, before the expiration of the Howard leases, respondent began negotiations with Standard Oil Company of Texas and Reno Oil Company, owners of the Gist and Crownover leases, which resulted in respondent obtaining the farm-outs on these two leases. The farm-out agreement was dated April 4, 1950, and was approved and accepted by respondent, D. H. Bolin, on May 6, 1950. On March 9th or March 10th, 1950, Standard Oil Company of Texas showed respondent the geology in the area. Respondent had theretofore drilled two wells on the Howard leases, both dry holes. G. W. Oliver, superintendent of Standard Oil Company of Texas, testified that the drilling of the two wells on the Howard lands by the partnership did contribute to the geological overall picture in the area. Respondent knew these facts before the expiration of the original Howard leases. Mr. Oliver testified that all this information had value from the geological point of view. Prior to the drilling of the two wells on the Howard lands, one of the petitioners had urged respondent to drill the Howard #2 well in the northwest corner of the Howard lands. This location would have been nearer and more adjacent to the Gist and Crownover farm-outs. Mr. Bolin drilled in the southeast corner and the well was a dry hole. On March 9th or 10th, 1950, respondent had before him the report of his geologist, N. A. Kendall, which reflected that a local reef condition seemed indicated. Kendall's report was also made to Standard Oil Company of Texas on February 6, 1950. When Mr. Kendall made this report the Howard leases were still in force, and the original agreement was in effect, according to the contention of petitioners. The report contains the following: "* * * as to your inquiry about our next location, on the west 320 acres of the Howard tract, we are yet undecided, but chances are that we want to try to define this 1900-ft. reef possibility, since it did have a substantial oil show. If you folks could suggest a location that would suit this purpose and at the same time can furnish information that would be of value to you, we would be glad to get together with you. Inasmuch as we will probably wind up our present well in the next week or 10 days, we would like to have an eventual joint location agreed upon by that time." The report or letter was signed "Bolin Oil Company, by N. A. Kendall."

The evidence shows that on March 9th or 10th, 1950, respondent gained further geological information. The negotiations resulted in respondent obtaining the farm-outs and the Howard leases. The well on the Gist land was completed as a commercial producer in June, 1950. Respondent first represented to petitioners that Standard Oil Company of Texas was the producer of these wells, then later, admitted he was the producer and also had the Howard leases. The well was produced from the "Cronoidal" or "Crinoidal" lime, the same as mentioned in the report of February 6, 1950. Respondent acquired the renewal leases on the Howard lands in June, 1950, before the completion of the Gist well. The wells on the Howard lands are producing from the same formation as the Gist lease. There were eleven producing wells on the Howard lands at the time of the hearing of the motion for summary judgment. The respondent billed petitioners for their part of the operating expense, and they paid their part for all the dry holes, but when oil was finally produced the petitioners were told they had no interest in the producing wells. The statement of facts consists of 728 pages. We wish to reiterate that we do not decide the evidence in favor of or against either party, but we hold it raises a fact question or fact questions as to the Howard leases to be determined by a trial court or jury, and not this Court or the Court of Civil Appeals.

The extent of the geological knowledge and information obtained by D. H. Bolin in the development of the Howard lands, jointly with petitioners, and whether this geological information was a motivating circumstance in his acquisition of renewal leases covering the Howard lands are matters principally within the mind of Mr. Bolin.

The rule with respect to the use of knowledge or information by one who stands in a confidential or fiduciary relationship is well stated in Restatement of the Law, Restitution, Chap. 12, Sec. 200; Fitz-Gerald v. Hull, supra; Pomroy's Equity Jurisprudence, 4th Ed., Vol. 3, par. 1050; Schiller v. Elick, 150 Texas 363, 240 S.W. 2d 997; Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1; Ballard v. Claude Drilling Company, 149 Kan. 506, 88 Pac. 2d 1021, 1023.

In the case of Meinhard v. Salmon, supra, Salmon negotiated and obtained for himself a new lease on certain property which had been under lease by Salmon and Meinhard operating under a joint venture agreement. Salmon was the sole manager of the property. The new lease included some adjoining property not

included in the original lease. The court sustained Meinhard's suit to establish his interest in the property, both the original and the adjoining property, on the theory of constructive trust for his benefit. The court, in an opinion by Chief Justice Cardozo, (249 N.Y., 463, 464) said:

"Joint adventures, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Wendt v. Fischer, 243 N.Y. 439, 444, (154 N.E. 303). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

As managing partner of their partnership enterprise, respondent owed his partners even a greater duty of loyalty than is normally required. In the Meinhard v. Salmon case, supra, the court said: "Salmon had put himself in a position in which thought of self was to be renounced, however hard the abnegation. He was more than a coadventurer. He was a managing coadventurer. * * * For him and for those like him, the rule of undivided loyalty is relentless and supreme." MacDonald v. Follett, 142 Texas 616, 180 S.W. 2d 334.

When Bolin Oil Company, through Mr. Kendall, made its geological report to Standard Oil Company on February 6, 1950, the original Howard leases had not expired. Respondent was managing the partnership, drilling the wells and performing his obligations under the agreement of December 1, 1946. Under the evidence, Standard could have believed respondent owned the lease in his own right and that no one else was interested. In fact, he was holding the lease as a fiduciary for himself and the petitioners. As said in the Salmon case, supra, "* * * the pre-emptive privilege, or, better the pre-emptive opportunity, that was thus an incident of the enterprise, Salmon appropriated to himself in secrecy and silence, He might have warned Meinhard that the plan had been submitted, and that either would be free to compete for the award. If he had done this, we do not

need to say whether he would have been under a duty, if successful in the competition, to hold the lease so acquired for the benefit of a venture then about to end, and thus prolong by indirection its responsibilities and duties. The trouble about his conduct is that he excluded his coadventurer from any chance to compete, from any chance to enjoy the opportunity for benefit that had come to him alone by virtue of his agency. This chance, if nothing more, he was under a duty to concede. The price of its denial is an extension of the trust at the option and for the benefit of the one whom he excluded."

Petitioners alleged that they reposed the utmost confidence and trust in the said D. H. Bolin. Petitioners proved that the respondent made many reports to them with reference to the dry holes and they paid out many thousands of dollars in such operations, and that they participated in the expense incident to securing the geological information which respondent obtained and later used to his personal advantage and to the exclusion of petitioners. Petitioners alleged that respondent, D. H. Bolin, "'* * * wilfully concealed from these plaintiffs his negotiations to acquire farm-outs on said adjoining leases."

While the new leases on the Howard lands were not actually obtained until after March 12, 1950, the evidence presents a fact issue as to whether a fiduciary relationship existed at the time of acquisition of such rights in the name of Bolin to the exclusion of petitioners. This Court in the Case of Fitz-Gerald v. Hull, supra, (150 Texas 39, 237 S.W. 2d 261), said:

" 'While a confidential or fiduciary relationship does not in itself give rise to a constructive trust, an abuse of confidence rendering the acquisition or retention of property by one person unconscionable against another suffices generally to ground equitable relief in the form of the declaration and enforcement of a constructive trust, and the courts are careful not to limit the rule or the scope of its application by a narrow definition of fiduciary or confidential relationships protected by it. An abuse of confidence within the rule may be an abuse of either a technical fiduciary relationship or of an informal relationship where one person trusts in and relies upon another, whether the relationship is a moral, social, domestic, or merely personal one.' Sec. 225, 54 Am. Jur., 'Trusts,' p. 173."

Thes application of the summary judgment rule is well stated in McDonald on Texas Civil Practice, Vol. 4, Sec. 17.26, pp.

1380 and 1382, and in the case of Gulbenkian v. Penn, 151 Texas 412, 252 S.W. 2d 929, 931, 932. In the latter, this Court said:

"* * * The duty of the court hearing the motion for summary judgment is to determine if there are any issues of fact to be tried, and not to weigh the evidence or determine its credibility, * * *.

"The general rule is that if a motion involves the credibility of affiants or deponents, or the weight of the showings or, it is said, a mere ground of inference, the motion will not be granted * * *."

We are of the opinion that the trial court correctly sustained respondent's motion for summary judgment with regard to the property described as to the Gist and Crownover leases, and therefore as to such leases the action of the trial court and the Court of Civil Appeals is sustained.

The petitioners, as a part of their cause of action, prayed for an accounting and the appointment of an auditor to audit the partnership books kept by Bolin in connection with the partnership. The action of the trial court in granting respondent's motion for summary judgment also denied the prayer for an accounting. The Court of Civil Appeals has affirmed such action, except as to the plea for an accounting upon the delay rental payments due and paid on the Howard land leases in 1948 and 1949, and as to the accounting as to the dissolution of partnership of December 1946. The respondent does not complain of the judgment of reversal as to the plea for accounting.

The judgment of the Court of Civil Appeals is affirmed as to the plea for an accounting and the judgments of the trial court and Court of Civil Appeals are affirmed as to the property described as the Gist and Crownover farm-out leases and reversed and remanded to the trial court for trial on the merits as to the Howard leases.

Opinion delivered July 14, 1954.

MR. JUSTICE CULVER, joined by JUSTICES GARWOOD and WILSON, dissenting.

I dissent from the majority opinion in so far as it holds that there is a fact issue in respect to the Howard leases. For the rea-

son that the matter of the Howard leases is so closely interwoven with the facts pertaining to the acquisition by Bolin of the Gist and Crownover "farm-outs," it may be appropriate to discuss both phases of the case.

On December 1, 1946, the parties entered into an agreement denominated "Articles of Partnership" (set forth in the Court of Civil Appeals opinion). All of the petitioners were business or professional men, though it was known to all at the time that one of the petitioners, Smith, had theretofore been engaged with others in oil ventures; that Bolin was primarily and had been for over thirty years acquiring and drilling oil properties and was to continue his own operations. The petitioners and Bolin were acquaintances and friends over a period of years.

Each venture undertaken was proposed to the other partners and mutually accepted. The first project was based upon Bolin's letter of December 6, 1946, to the effect that he had three blocks of leases in Comanche County, Oklahoma at $3.00 per acre and the partnership would reimburse him at that valuation. The wells drilled thereon in 1947 proved to be nonproductive. Bolin drew checks on the partnership account payable to himself for the purchase of the leases and the drilling expenses and rendered detailed accounting to his partners.

In May of 1947 Bolin informed his associates that he had obtained some 580 acres in Montague County, Texas, known as the Howard leases and recommended that these properties be tested.

On May 12, 1947, in his letter to them Bolin stated:

"Therefore, believing it is a good place to drill and having the approval of Messrs. Nail, Smith, Gale Denny and E. A. Denney, I would like to know from all of you if it is agreeable to proceed to drill two wells on this acreage on the same basis that we have heretofore drilled, with the one exception that the acreage will be about $7.00 per acre to the group." (S.F. 535-536)

At this point two of the original members withdrew, Doctors Arrington and Reagan, whose interests were taken over by Theo Beck and by Dr. Smith, one of the original partners. The first well drilled was completed as a dry hole in September of 1947 and an accounting rendered by Bolin to his partners in detail showing the drilling expenses as $10,776.87. He had theretofore reimbursed himself out of the partnership funds for the cost of acquiring the 580-acre Howard block at $6.00 per acre. In Octo-

ber of the same year Bolin sent to each partner a statement of credits and debits up to that date. Therefore, by the end of 1947 the original Howard land leases had been paid for, and all of the bills created by the first group in the Oklahoma drilling operations had been paid. The expenses incurred by the second group in drilling the first well on the Howard land leases had been defrayed and all of the money originally contributed by the parties was exhausted. During the year 1947 the delay rentals were not paid on the three Oklahoma blocks and consequently those leases expired. In July of 1948 Bolin arranged for the drilling of a second well on the Howard land leases, resulting in a "dry hole."

On August 18, 1949 Bolin wrote the petitioners calling their attention to the fact that the leases would expire early in 1950 and recommended the drilling of two more wells, stating that while dry holes would probably result, he was unwilling to have the leases expire without further drilling and that if any preferred not to participate he would take over their interest. The Standard Oil Company agreed to contribute toward the cost of drilling. It proved to be unproductive. Smith declined to participate in the drilling of this well and, in fact, was then engaged in the drilling of some wells elsewhere. Only three of the petitioners agreed to participate and paid their prorata part of the expense. A fourth agreed but failed to pay until some two years later at the time of the filing of this suit when he tendered a check to Bolin, that was not accepted. No further operations were conducted by the partnership and the original leases covered the Howard lands expired on March 12, 1950.

G. W. Oliver, Division Exploration Superintendent of Standard Oil Company, testified that for the first time he received authority from his company about March 1, 1950, to drill some of the company's leases on a "farm-out basis" and that prior to that time a "farm-out" would not have been considered. He thereupon proposed such a contract to several parties and other members of his staff made similar efforts, all of which proposals were rejected. He then entered into negotiations with Bolin resulting in the acceptance of the Standard proposal on May 6, 1950, by the terms of which Bolin was to drill three wells at an estimated cost of $30,000 or more on the Gist and Crownover lands. Bolin then sought to find someone to share the expense of these operations, ultimately contracting with certain California people, also defendants herein, who, agreed to bear two-thirds of the estimated expense in consideration of a proportionate interest, Bolin agreeing to carry the remaining one-third.

On June 14, 1950, the first well was completed as a dry hole and on the following day Bolin began the drilling of a well on the Gist lease, which was shortly thereafter completed as a commercial producer.

On the 19th day of June when Bolin first knew that the Gist farm-out was a "producer," he authorized a broker to secure leases from the fee owners of the Howard land which were obtained for Bolin at a cost of $15.00 per acre. This was the same land on which leases had formerly been owned by the partnership and which had expired in March of 1950.

I agree with the majority opinion of the Court of Civil Appeals that petitioners have not discharged the burden of raising an issue of fact and that the trial court properly entered summary judgment in favor of respondents.

Petitioner Smith testified that he had on more than one occasion urged Bolin to acquire the farm-out leases. His insistence was founded on some exploration nearby which he had done as a member of a former partnership. Bolin finally, toward the end of November, 1949, replied that the geology had been thoroughly checked. No merit was found in it and he was not further interested.

In my opinion this testimony is not sufficient to show a violation of any fiduciary relationship. The partnership ventures were each on a separate basis and agreed to by all of the parties before operations commenced. I see no obligation on Bolin's part after acquiring the farm-outs to have offered them to the petitioners for participation. Bolin's conduct does not comport with petitioners' contention. He was still enjoying a friendly relationship with them. It is unreasonable to conclude that he would search out strangers in California if he had believed that petitioners would be interested to the extent of putting up the necessary $22,000 in this venture.

With respect to the Howard leases, considerable store is laid in the testimony of one of the petitioners, Nail, who related a conversation with Bolin in February of 1950 just prior to the expiration of the Howard leases, in which Nail urged Bolin to get a renewal or an extension of the Howard leases for the members of the partnership. Bolin replied, "We could no more get that than we could get wings to fly to Heaven this afternoon." Now whatever credence Nail may have given to that statement there is no indication that it was relied on to his detriment or

created any inference of an intention on Bolin's part to secure the leases for himself. For three months after the expiration the lands lay unleased, available to any and all willing to buy and pay the price. The fact seems to be established beyond doubt, that it was not until and on account of the Gist well that Bolin became interested in the reacquisition of the Howard leases. This well was located in the south center of a 100-acre tract adjoining the Howard leases on the north and at most only a few hundred feet away.

It is my opinion that there are no facts nor inferences to support the claimed violation of a fiduciary relationship in the obtaining by Bolin of these leases. There seems to be no showing that any geological information obtained by the drilling done on the Howard leases while the partnership arrangement was effective that induced Bolin to purchase the farm-out leases or to obtain the renewal of the Howard leases for his personal benefit.

Many wells had been drilled in this general area. The respondent Bolin, had on his own account been active in prospecting for oil and drilling in the vicinity. Unquestionably each well added to the geological picture, but to say that the data, obtained from the wells drilled by the partnership in the extreme south part of the Howard leases, was a causative factor enters the realm of speculation.

The evidence, in my opinion, fails to raise an issue of fact sufficient to be submitted to a jury for determination and therefore summary judgment for respondents was proper. Willoughby v. Jones, 151 Texas 435, 251 S.W. 2d 508; Fowler v. Texas Employers Insurance Co., Texas Civ. App., 237 S.W. 2d 373, wr. ref.

I would affirm the judgment of the Court of Civil Appeals.

Opinion delivered July 14, 1954.

Rehearing overruled October 13, 1954.